# Exhibit A

Druckerman Declaration & Excerpts of 2025 Credit Reporting Resource Guide

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EARL THOMAS<br>Plaintiff,<br>v.<br>UNITED STATES DEPARTMENT OF EDUCATION, ET AL.<br>Defendants. | No. 2:26-CV-02371-CFK |

**DECLARATION OF DAVID DRUCKERMAN**

I, David Druckerman, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate to the best of my information and belief:

1. I have been employed as a Supervisor (Branch Chief) with the United States Department of Education ("the Department" or "Education"), Federal Student Aid ("FSA") based out of Washington, D.C. since August 2024. Specifically, I work in FSA's Office of Loan Portfolio Management, acting, in part, as the Department liaison to the nationwide consumer reporting agencies ("CRAs"). I make this declaration based on my knowledge and review of records maintained in the ordinary course of business. If called to testify, I would testify competently to the matters stated herein.

2. Pursuant to Section 430A of the Higher Education Act of 1965, as amended (20 U.S.C. § 1080a), the federal government is required to provide to CRAs data regarding each debt that it holds until it is repaid. Education contracts with third-party student loan servicers to perform loan servicing and related administrative functions for federally held student loans, including furnishing credit information to CRAs on Education's behalf.

3. The information furnished to CRAs may include, among other things, the date a debt was opened, original loan amount, debt type, repayment status, delinquency date, if any, debt balance, and monthly payment information. Education does not itself register as a data furnisher with the CRAs or, in the ordinary course of business, directly transmit this consumer account information to the CRAs. Rather, Education's loan servicers are registered with Equifax, Experian, Trans Union, and Innovis as the furnishers of credit information concerning the loans they service, including Plaintiff's federally held student loans.

4. Education also contracts with its loan servicers to perform other administrative functions relating to federally held student loans, including borrower communications, payment processing, account maintenance, and responding to consumer credit reporting disputes. The servicers operate pursuant to federal contracts that establish their contractual responsibilities and

require compliance with applicable federal law, including the Fair Credit Reporting Act ("FCRA"). The contracts do not prescribe the particular investigative methods or procedures a servicer must use when responding to an individual credit reporting dispute. Each servicer maintains and applies its own policies, procedures, and compliance controls for credit reporting and dispute investigations.

5. The loan servicers independently furnish credit information to the CRAs and independently respond to consumer credit reporting disputes transmitted by the CRAs. In performing those functions, a servicer has authority to review the applicable loan account, determine whether reported information is accurate and complete, and, when warranted, correct, modify, update, or delete information it previously furnished. In the ordinary course of business, Education does not receive the monthly reporting files submitted by its loan servicers to the CRAs or individual credit disputes transmitted by CRAs to the servicers.

6. The name of the data furnisher appearing in connection with a federally held student loan tradeline may include both the applicable servicer's name and "US Department of Education." The inclusion of "US Department of Education" identifies the debt as a federal student loan and does not mean that Education itself transmitted the credit information to the CRA. The applicable loan servicer establishes the furnisher information with the CRAs and is the registered data furnisher for the reported account.

7. The loan servicers submit student loan data to the CRAs using account-specific identifiers, including Debt Numbers. Each servicer also has subscriber codes assigned by the CRAs. When a consumer disputes information concerning a particular tradeline, the CRA routes the dispute to the furnisher associated with that tradeline and subscriber code. Thus, a dispute concerning a tradeline furnished by a particular servicer is routed to that servicer rather than to another servicer or to Education.

8. The CRA converts a consumer's dispute into a standardized electronic form known as an Automated Consumer Dispute Verification ("ACDV"). An ACDV may include dispute codes, consumer-provided comments, and relevant account identifiers. The e-OSCAR system facilitates the electronic transmission of ACDVs and responses between CRAs and the applicable furnishers. The servicer associated with the disputed tradeline receives the ACDV and responds directly to the initiating CRA.

9. According to the Credit Reporting Resource Guide, which is a technical and compliance manual published by the Consumer Data Industry Association and a standardized framework relied upon by the CRAs, a data furnisher is the "[c]ompany who provides consumer credit accounts receivables to one or more consumer reporting agency."[1]

10. The Department itself does not receive, review, or process ACDV forms or similar CRA dispute notifications concerning individual borrowers. Nor do the Department's loan servicers ordinarily forward those disputes to the Department. Instead, the applicable loan servicer

[1] The 2025 version of the Credit Reporting Resource Guide explains in the Responsibilities and Roles section that the data furnisher is the company that provides the consumer account information to the CRAs, annexed hereto as Exhibit A.

associated with the disputed tradeline independently receives the dispute, conducts the investigation, reviews the account-level information, determines whether any correction is warranted, and communicates its response directly to the initiating CRA. The loan servicer does not submit its proposed response or investigative findings to the Department for review or approval before responding to the CRA.

11. In conducting a dispute investigation, a loan servicer generally reviews the borrower's loan account, including the applicable account status, payments, financial information, demographic information, deferments, forbearances, and other account activity. The loan servicer then compares the information identified in the ACDV with information maintained in its servicing system and, when appropriate, corrects or updates inaccurate or outdated data fields. Corrected or updated information is transmitted to the initiating CRA through e-OSCAR. Information that cannot be modified through the ACDV process may be updated through the servicer's next regular monthly reporting cycle.

12. Education does not direct, supervise, or control the day-to-day methods or specific investigative steps used by its loan servicers in responding to individual consumer credit disputes. Although Education establishes contractual performance requirements and legal compliance expectations and may issue general guidance concerning servicing operations, it does not prescribe how a servicer must investigate a particular dispute, which records it must review, how it must evaluate the dispute, or what conclusion it must reach. Those operational decisions are made by the applicable servicer in accordance with its policies, procedures, contractual obligations, and applicable law.

13. Similarly, Education does not require prior approval before a loan servicer corrects, modifies, updates, or deletes information previously furnished to a CRA when the servicer determines, based on its investigation or applicable law, that such action is warranted. The servicers generally notify Education only regarding broader complaint trends or issues affecting more than 25 borrowers.

14. Education does not compile, generate, or maintain consumers' credit reports and does not control how, when, or in what manner information furnished by a loan servicer is displayed, interpreted, or otherwise reflected in a consumer's credit report by a CRA.

15. With respect to Plaintiff, based on my review of Department records maintained in the ordinary course of business, the Department received notices from MOHELA regarding Plaintiff's administrative ID theft discharge applications starting in February 2024. However, the Department has no record of receiving from a CRA or a Department loan servicer an ACDV or other CRA dispute concerning Plaintiff's student loans held by the Department.

16. Based on my review of the Department's records and my knowledge of the Department's loan servicing operations, I am not aware of any action taken by Education itself concerning Plaintiff's alleged inaccurate tradelines, including any direct reporting of Plaintiff's account to a CRA or any investigation or response to a CRA dispute concerning Plaintiff. Any information furnished to the CRAs concerning Plaintiff's federally held student loans would have been transmitted by the applicable loan servicer in its capacity as the registered data furnisher.

17. The Department's records further do not reflect that Education reviewed, approved, or authorized any monthly credit reporting transmission concerning Plaintiff before it was submitted to the CRAs. Nor do those records reflect that Education directed a loan servicer to report inaccurate information or otherwise report Plaintiff's account in a manner inconsistent with the account information maintained in the Department's systems of record.

18. Accordingly, to the extent Plaintiff alleges injury arising from the furnishing of inaccurate credit information or the handling of a CRA dispute, the credit reporting and dispute-resolution activities at issue would have been performed, if at all, by the applicable loan servicer in its capacity as the furnisher of information to the CRAs, rather than by Education itself

Executed on this ___ day of ____________ 2026.

DAVID DRUCKERMAN

Digitally signed by DAVID DRUCKERMAN
Date: 2026.08.18 09:51:06 -04'00'

David Druckerman
Branch Chief
U.S. Department of Education

# EXHIBIT A

# 2025 Credit Reporting Resource Guide®


*Copyright 2025 © Consumer Data Industry Association*

# CONSUMER DATA INDUSTRY ASSOCIATION (CDIA) END USER LICENSE AGREEMENT TERMS AND CONDITIONS

1. **LICENSE GRANT.** Conditioned on your continued compliance with the terms and conditions of this License Agreement, this License Agreement provides you, **as an individual**, with a **personal**, revocable, limited, non-exclusive, and nontransferable license to use the Credit Reporting Resource Guide® (CRRG®) for your informational and internal business purposes only. The foregoing grant permits you to download a single electronic copy to a single computer or laptop and also print a single hard copy of the CRRG® from a single computer or laptop, provided that such copy contains all applicable proprietary notices. Notwithstanding the foregoing, any rights granted hereby are licensed and not sold or otherwise transferred or assigned to you or any third party.
2. **LICENSE GRANT RESTRICTIONS.** Except as provided above, you may not modify, alter, translate, create derivative work(s) of, distribute, display, broadcast, transmit, reproduce, publish, license, sub-license, sell, exploit, rent, lease, grant a security interest in, assign or transfer any right(s) in, or otherwise use in any manner not expressly permitted herein the CRRG® or any part thereof. Specifically, you expressly agree that you are not using the CRRG® for competitive reasons (against Consumer Data Industry Association (CDIA)) or for the purpose of designing or developing similar materials. In addition, you may not remove or alter any proprietary notice on the CRRG® **or use any portion of the CRRG® independently from the CRRG® as a whole**. All rights not expressly granted to you herein are hereby reserved to CDIA.
3. **USER OBLIGATIONS.** By installing, downloading, accessing, and/or using the CRRG®, you represent that you are of the legal age to create a binding agreement with CDIA and agree to abide by all applicable local, state, national, and international laws and regulations with respect to your use of the CRRG®. You also agree to assume all responsibility concerning your use of the CRRG®, including meeting any requirements or obligations of your contracts with third parties. CDIA assumes no responsibility or liability for any claims that may result directly or indirectly from the communications, agreements, or interactions you establish with third parties using the CRRG®.
4. **PROPRIETARY RIGHTS.** CDIA or its licensors shall retain all ownership right, title, and interest, including, without limitation, all associated intellectual property or proprietary rights, in and to all text, graphics, methodologies, processes, procedures, content, products, information, and documentation associated with the CRRG® as well as its design, structure, "look and feel," and arrangement of any content contained on or available through the CRRG®. The "Credit Reporting Resource Guide®" and its contents are © Consumer Data Industry Association and/or its licensors. All rights reserved. CREDIT REPORTING RESOURCE GUIDE®, CONSUMER DATA INDUSTRY ASSOCIATION, CDIA, and all other names, logos, and icons identifying CDIA and its products and services are proprietary trademarks of CDIA, and any use of such marks without the express written permission of CDIA is strictly prohibited. Except as expressly provided herein, CDIA does not grant any express or implied right to you or any other person under any intellectual or proprietary rights.


*Copyright 2025 © Consumer Data Industry Association*

5. **CONFIDENTIALITY.** You acknowledge and agree that the certain parts of the CRRG® contain proprietary trade secrets and confidential information of CDIA (the "Confidential Information"). You agree to secure and protect the confidentiality of this Confidential Information of CDIA in a manner consistent with the maintenance of CDIA's rights therein, using at least as great a degree of care as you use to maintain the confidentiality of your own confidential information of a similar nature, but in no event using less than reasonable efforts. You shall not, nor permit any third party to, sell, transfer, publish, disclose, or otherwise make available any portion of the Confidential Information to third parties, except as expressly authorized in this License Agreement.

6. **SUBMISSIONS.** CDIA welcomes your feedback and suggestions about how to improve the CRRG®. You agree that CDIA shall have the perpetual, royalty-free, and irrevocable right to use such feedback and suggestions in any manner it deems desirable without providing any consideration, attribution, or payment to you.

7. **DISCLAIMER.** ALTHOUGH CDIA HAS USED COMMERCIALLY REASONABLE EFFORTS TO PROVIDE ACCURATE INFORMATION, NEITHER CDIA NOR THE CRRG® OFFERS ANY LEGAL OR OTHER PROFESSIONAL ADVICE. CDIA ALSO MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT THE SUITABILITY, COMPLETENESS, TIMELINESS, RELIABILITY, LEGALITY, OR ACCURACY OF THE CRRG® FOR ANY PURPOSE. THE CRRG® IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, INCLUDING, WITHOUT LIMITATION, ALL IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT AS WELL AS ANY WARRANTY RELATED TO THE USE, OR THE RESULTS OF THE USE, OF THE CRRG®. THE ENTIRE RISK AS TO THE QUALITY OF AND RESULTS FROM THE USE OF THE CRRG® IS WITH YOU, AND YOU SHOULD NOT RELY ON ANY CONTENT IN THE CRRG® AS THE SOLE BASIS FOR ACTION OR ASSUME THAT ANY TACTICS DESCRIBED THEREIN WOULD, BY THEMSELVES, ACHIEVE A PARTICULAR RESULT. IF ANY OF THE DISCLAIMERS OR EXCLUSIONS SET FORTH IN THIS SECTION ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION TO BE UNENFORCEABLE, THEN ALL SUCH EXPRESS AND IMPLIED WARRANTIES AND CONDITIONS PERMITTED BY LAW SHALL BE LIMITED IN DURATION FOR A PERIOD OF 30 DAYS AFTER THE EFFECTIVE DATE OF THIS AGREEMENT AND NO WARRANTIES OR CONDITIONS SHALL APPLY AFTER THAT PERIOD.

8. **LIMITATION OF LIABILITY.** YOU AGREE THAT IN NO EVENT SHALL CDIA BE LIABLE FOR ANY INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE USE OF THE CRRG® BY YOU OR ANYONE ELSE, WHETHER BASED IN CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, EVEN IF CDIA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. WITHOUT LIMITATION OF THE FOREGOING, THE TOTAL LIABILITY OF CDIA FOR ANY REASON WHATSOEVER RELATED TO USE OF THE CRRG®, INCLUDING FOR ANY INACCURACIES IN THE CRRG®, OR FOR ANY CLAIMS RELATING TO THIS LICENSE AGREEMENT SHALL NOT EXCEED $1,000 (USD).

9. **INDEMNITY.** You agree to defend, indemnify, and hold harmless CDIA and its affiliates, employees, licensors, agents, directors, officers, partners, representatives, shareholders, attorneys, predecessors, successors, and assigns from and against any and all claims, proceedings, damages, injuries, liabilities, losses, costs, and expenses (including reasonable attorneys' fees and litigation expenses) relating to or arising from your use of the CRRG® and any breach by you of this License Agreement.


*Copyright 2025 © Consumer Data Industry Association*

10. **GOVERNING LAW.** This License Agreement has been made in and will be construed and enforced solely in accordance with the laws of the District of Columbia as applied to agreements entered into and completely performed in the District of Columbia. Any dispute, controversy, or claim between the parties arising out of or in connection with this License Agreement as to its conclusion, existence, validity, interpretation, performance, or non-performance, breach, termination, and the assessment of damages including claims in tort whether arising before or after the termination of the License Agreement shall be resolved in accordance with this License Agreement. You also agree that any action to enforce this License Agreement will be brought solely in the federal or state courts in the District of Columbia, and all parties to this License Agreement expressly agree to be subject to the jurisdiction of such courts.

11. **TERM AND TERMINATION.** This License Agreement and your right to use the CRRG® will take effect at the moment you click "I ACCEPT" or you install, download, access, or use the CRRG®, whichever occurs first, and is effective until terminated as set forth below. This License Agreement will terminate automatically if you click "I REJECT" or if you fail to comply with any of the terms and conditions described herein, including by exceeding the scope of the license. Termination or expiration of this License Agreement will be effective without notice. You may also terminate at any time by ceasing to use the CRRG®, but all applicable provisions of this License Agreement will survive termination, as outlined below. Upon termination or expiration, any right to use the CRRG® will immediately cease and you must return, destroy, or delete from your system all copies of the CRRG® (and any associated materials) in your possession. The miscellaneous provisions as well as the provisions concerning CDIA's proprietary rights, submissions, confidentiality, indemnity, disclaimers of warranty and liability, termination, and governing law, however, will survive the termination or expiration of this License Agreement for any reason.

12. **MISCELLANEOUS.** The parties agree that this License Agreement is for the benefit of the parties hereto. Failure to insist on strict performance of any of the terms and conditions of this License Agreement will not operate as a waiver of that or any subsequent default or failure of performance. A printed version of this License Agreement and of any related notice given in electronic form shall be admissible in judicial or administrative proceedings based upon or relating to this License Agreement to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form. No joint venture, partnership, employment, alliance, or agency relationship exists between you and CDIA as result of this License Agreement or your utilization of the CRRG®. Moreover, you may not bind CDIA in any way or otherwise make any representations or statements for or on behalf of CDIA without CDIA's separate, express, and written permission. This License Agreement represents the entire agreement between you and CDIA with respect to use of the CRRG® and it supersedes all prior or contemporaneous communications and proposals, whether electronic, oral, or written between you and CDIA with respect to the CRRG®. If any provision of this License Agreement is held by a court of competent jurisdiction to be contrary to law, such provision shall be changed and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law and the remaining provisions of this License Agreement will remain in full force and effect. This License Agreement and any rights granted by CDIA may not be assigned or transferred by you without the prior express written consent of CDIA. If you have any questions regarding this License Agreement, the CRRG®, or other CDIA products or services, please contact CDIA at 1090 Vermont Avenue, NW, Suite 200, Washington, DC 20005, or www.cdiaonline.org.


*Copyright 2025 © Consumer Data Industry Association*

# Responsibilities and Roles

## RESPONSIBILITIES

Credit reporting information is sensitive data. The issues of accuracy and completeness of information and fairness to consumers are not just a concern of the consumer reporting agencies; credit grantor participation is also required. Federal and state laws already regulate certain aspects of credit reporting. In order to protect your ability to conduct business without the further intervention of external forces, you must participate in the accuracy process.

Both credit grantors and consumers depend on consumer reporting agencies to acquire and maintain accurate credit histories. This can only be accomplished if the provider of consumer data understands the tools that are available and adheres to the standards for credit reporting.

The purpose of this guide is to document this very important process and includes:

- Industry Standards
- Metro 2® Format
- Metro 2® Validation/Implementation Checklist
- Automated Universal Data Process
- Automated Consumer Dispute Verification

The Metro 2® Format Task Force strongly encourages you to make the fullest use of the tools and procedures outlined in this guide, and to contact the consumer reporting agencies at any time for whatever assistance you may need.


*Copyright 2025 © Consumer Data Industry Association*

Return to Table of Contents

# Responsibilities and Roles

## ROLES

**Consumer Data Industry Association (CDIA)**
An international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries. Headquartered in Washington, DC, CDIA provides legislative assistance and a lobbying function to its members, and works with the consumer reporting agencies to establish standards for the consumer reporting industry.

For more information about CDIA, visit their website at www.cdiaonline.org.

**Consumer Reporting Agencies**
Individual companies that collect, store, maintain and distribute information on consumer credit history.

For more information about the agencies, visit their websites at:

www.equifax.com
www.experian.com
www.innovis.com
www.transunion.com

**Metro 2® Format Task Force**
Despite the competitive and organizational barriers within the credit industry, the consumer reporting agencies continue to work together to develop, maintain and enhance an industry-standard reporting format. The task force's mission is to provide a standardized method for the reporting of accurate, complete and timely data.

The Metro 2® Format Task Force is comprised of representatives from Equifax, Experian, Innovis and TransUnion and is supported by the CDIA.

For information specific to data reporting, click on the Metro 2® option at www.cdiaonline.org.


*Copyright 2025 © Consumer Data Industry Association*

Return to Table of Contents

# Responsibilities and Roles

**e-OSCAR® System Support Team**
This group maintains an industry-wide automated consumer dispute resolution system, which is required by the Fair Credit Reporting Act (FCRA) section 611 (a) (5) (D). This team includes representatives from Equifax, Experian, Innovis and TransUnion.

For information specific to consumer disputes, click on the e-OSCAR® option at www.cdiaonline.org.

**Data Furnisher**
Company who provides consumer credit accounts receivables to one or more consumer reporting agency.

Duties of furnishers are described in FCRA (section 623). See https://consumer.ftc.gov/system/files/consumer_ftc_gov/pdf/notice-to-furnishers.pdf for additional information.


*Copyright 2025 © Consumer Data Industry Association*

# Responsibilities and Roles

**Consumer Financial Protection Bureau (CFPB)**
The Consumer Financial Protection Act of 2010 (Title X of the Dodd-Frank Act) created the Consumer Financial Protection Bureau (CFPB) and granted to it supervisory, rule-making, and enforcement authority over consumer reporting agencies and it has powers to regulate the broader consumer reporting ecosystem. The CFPB oversees a number of rules promulgated under the FCRA. These rules are found in the Code of Federal Regulations (CFR), Tit. 12, Ch. X, Part 1002, commonly called Reg. V. Among its responsibilities, the CFPB writes rules under and enforces the FCRA, and takes consumer complaints related to the FCRA. More information can be found on the internet at http:/www.consumerfinance.gov.

The CFPB has a dedicated webpage to consumer reporting: https://www.consumerfinance.gov/compliance/compliance-resources/other-applicable-requirements/fair-credit-reporting-act/.

**Federal Trade Commission (FTC)**
The federal Fair Credit Reporting Act (FCRA) was passed in 1970 and became effective in 1971. The FCRA is the primary law that governs the consumer reporting ecosystem by imposing duties and prohibitions on consumer reporting agencies, data furnishers, and data users; and by empowering consumers with certain rights. Since its initial passage, the FTC has played an important role in the implementation, oversight, enforcement, and interpretation of the FCRA. The CFPB allowed the FTC to retain its enforcement role but it now shares that role in many respects with the CFPB.

The FTC has a dedicated webpage to consumer reporting: https://www.ftc.gov/tips-advice/business-center/privacy-and-security/credit-reporting.


*Copyright 2025 © Consumer Data Industry Association*

Return to Table of Contents